IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
October 12, 2007 Session

**PHILLIP C. PENNY, KURTIS SCHILK, AND ROBERT TEBBETTS**
**v.**
**THE CITY OF MEMPHIS AND**
**CITY OF MEMPHIS CIVIL SERVICE COMMISSION**

An Appeal from the Chancery Court for Shelby County
No. CH-06-0108-2     Arnold Goldin, Chancellor

_____

No. W2007-00861-COA-R3-CV - Filed March 12, 2008

_____

This case involves the termination of a municipal police officer. The police department received a report on an attempted suicide by a mental patient. The appellant officer and other officers responded. When the officers arrived at the scene, the suicide victim was sitting on his front porch, bleeding from self-inflicted wounds. As the officers approached the individual, he tried to flee. Attempting to gain control over the individual, the officers repeatedly struck him with their police batons. The individual ran from the police and fell in the street. The officers again struck him with batons and handcuffed him while he was on the ground. The appellant officer held him on the ground by placing his baton across the back of his shoulders. Shortly afterward, the individual stopped breathing and died of a heart attack. After an investigation, three of the officers, including the appellant, were terminated for using excessive force in this incident. The terminations were upheld by the municipal civil service commission. The three officers then filed a petition for writ of certiorari, claiming that the commission's decision was arbitrary and unsupported by substantial and material evidence. The trial court granted the petition as to two officers and reversed their terminations. However, it denied the petition as to the appellant officer because his termination was based on his disciplinary history as well as his conduct during the incident in question. The terminated officer now appeals. We affirm, finding that the commission's decision to uphold the officer's termination was supported by substantial and material evidence in the record.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court is Affirmed**

HOLLY M. KIRBY, J., delivered the opinion of the Court, in which DAVID R. FARMER, J., and JOHN EVERETT WILLIAMS, SP. J., joined.

Thomas E. Hansom and Leigh H. Thomas, Memphis, Tennessee, for the Appellant, Kurtis Schilk.

Elbert Jefferson, Jr., City Attorney, and Gerald L. Thornton, Senior Assistant Attorney, Memphis, Tennessee, for the Appellee, City of Memphis.

# OPINION

On April 19, 2003, Petitioner Phillip Penny ("Officer Penny"), Petitioner Robert Tebbetts ("Officer Tebbetts"), and Petitioner/Appellant Kurtis Schilk ("Officer Schilk") were on duty as uniformed police patrol officers for the City of Memphis Police Department. Early that evening, a total of five officers, including Officers Schilk, Penny, and Tebbetts, were dispatched to a residence at 1115 South Rembert, Memphis, Shelby County, Tennessee, in response to an attempted suicide by a citizen identified as having a mental condition. When the first officers arrived at the home, they encountered Denvey Buckley ("Buckley") on the front porch of the home. Buckley was bleeding from multiple self-inflicted cuts about his arms and neck. It was later discovered that Buckley had also ingested liquid bleach and had been vomiting.

At some point, Buckley went back into his home. The second patrol car arrived, and all of the officers conferred and put on latex gloves. Buckley, unarmed, came back out onto the porch. The officers, fearing that Buckley would obtain a weapon in the house or take other adverse action, decided not to allow Buckley to re-enter the house.

As the officers approached the house, Buckley apparently realized that they intended to restrain him and tried to flee into his home. The officers tried to prevent Buckley from going back into the home, and Buckley resisted. This resulted in a struggle on the porch between Buckley and the officers. In order to gain control of Buckley, several of the officers, including Officer Schilk, began to hit him with their police batons, also called "night sticks," telling him to stay calm and that they were trying to help him. One officer sprayed Buckley with chemical spray. These efforts proved fruitless, and Buckley broke away from the officers. He jumped over a wall along the porch and headed toward the street. In doing so, Buckley fell in the street in front of his home.

After Buckley fell in the street, the officers caught up with him and again hit him with their batons and attempted to handcuff him. While Buckley was down on the road in a "push-up" position, Officer Schilk tried to keep Buckley on the ground by putting his baton across Buckley's shoulder blade and neck area. Soon after Buckley was subdued, the officers noticed that he had stopped breathing. They immediately alerted the emergency medical technicians ("EMTs") who were already present. The EMTs were unable to resuscitate Buckley, and he died on the scene.

Afterward, the Police Department conducted an internal investigation of the incident.[1] As part of the investigation, statements were taken from the officers involved, and an autopsy was performed. The autopsy showed that Buckley sustained five wounds to his upper torso that were consistent with baton strikes. The medical examiner was of the opinion that Buckley had an enlarged heart, that he had suffered a heart attack during the incident, and that he died as a result of his heart problem and not from either his self-inflicted wounds or the police officers' actions.

---

[1]The Attorney General's office conducted an investigation as well. It concluded that the force used did not constitute criminal conduct and, therefore, did not indict these officers for Buckley's death.

Subsequently, the City of Memphis ("City") charged Officers Penny, Schilk, and Tebbetts (collectively, "Petitioners") with use of excessive force in violation of police department DR-301.[2] No charges were brought against the other officers. In addition, Officer Schilk was charged with inappropriate personal conduct in violation of DR-104 for shouting profanities at bystanders.[3] On December 18, 2003, an administrative hearing was conducted by Deputy Chief Janice C. Pilot ("Chief Pilot"). After this hearing, all three officers were terminated from their employment with the City for the use of excessive force. In addition, Officer Schilk was given a five (5)-day suspension for violation of DR-104. The officers timely appealed to the Civil Service Commission Board ("the Commission").

The Commission's hearing was held on August 5, 2005. At the hearing, the City sought to prove that Officers Penny, Schilk, and Tebbetts used excessive force to restrain Buckley. The Commission first heard testimony from Sergeant Vincent Beasley ("Sergeant Beasley"), an officer at the police training academy. In his work at the training academy, Beasley said, he trained officers on the "deadly force continuum," that is the degree of force required in various situations. Sergeant Beasley said that verbal communications were to be used first; if they do not yield compliance from a suspect, then chemical spray or the baton may be used. He indicated that the baton was considered a defensive weapon, "used to keep people off of you." Deadly force is authorized only when a suspect threatens bodily harm to the officer or someone else, including themselves. In using the baton, Sergeant Beasley said, officers are trained to strike with the baton on five "motor points" near the joints on the suspect's arms and legs; this causes sufficient pain to be effective but results in the least amount of permanent damage. He acknowledged that, although officers are not trained to use the baton on the torso, there may be situations when this might occur. He also conceded that a strike

_____

[2]DR 301 Excessive Force states:

A. Control may be achieved through advice, warnings, and persuasion, or by the use of physical force. While the use of physical force may be necessary in situations which cannot be otherwise controlled, force may not be resorted to unless other reasonable alternatives have been exhausted or would clearly be ineffective under the particular circumstances. Members are permitted to use whatever force that is reasonable and necessary to protect others or themselves from bodily harm.

B. A member shall not use unnecessary force or violence in making an arrest or in dealing with a prisoner or any person. Prisoners and suspects shall be treated in a fair and humane manner. They shall not be humiliated, ridiculed, or taunted.

[3]DR 104 Personal Conduct states:

The conduct of each member, both on and off duty, is expected to be such that it will not reflect adversely on other members, the Department, the City of Memphis, or the law enforcement profession. This regulation applies to both the professional and private conduct of all members. It prohibits any and all conduct which is contrary to the letter and spirit of departmental policy and procedure which would reflect adversely upon the Department or its members. It includes not only all unlawful acts by members but also acts which, although not unlawful in themselves, would violate the Law Enforcement Code of Ethics, and would degrade or bring disrespect upon the member of the Department.

intended for the upper arm might land on a shoulder or head. Though officers are not trained to use the baton to hold people down, they are not trained that this would be improper. Sergeant Beasley was unaware of any recent change in the police department's policy on excessive force, DR-301.

The Commission also heard testimony from Chief Pilot, who made the decision to terminate the officers. She said that the decision to terminate them for use of excessive force was based on the information in the investigative file. The entire investigative file, with the exception of some photographs, was entered into evidence as a collective exhibit. This included the medical examiner's report and statements by Officers Penny, Tebbetts, and Schilk. Chief Pilot focused on the report of the medical examiner, which showed evidence that Buckley had been struck five times in the torso with the police batons. Although the medical examiner could not ascertain which officer's baton strikes left the marks, Chief Pilot noted that all of the officers admitted to using their batons while taking Buckley into custody. She said that she relied in part on a statement given by Lieutenant Anthony Rosser, the supervisor of recruit training at the City's police training academy. She understood Lieutenant Rosser's statement to mean that a baton should not be used to strike in the upper torso.

In her testimony, Chief Pilot acknowledged that, since the termination of the officers, she had discovered that baton strikes to the upper torso were in fact not unauthorized. Chief Pilot allowed that, had she correctly understood the policy, she possibly would not have terminated the officers' employment:

> Q: Let me ask you, first of all, with regard to the excessive force policy, has there been a change in that policy since this incident occurred?
> A: Yes, sir.
> Q. When did that change occur?
> A: I don't know the exact date, but it was around September of 2003. I don't know the exact date.
>          \* \* \*
> Q: Okay. So the policy was changed before you conducted the hearing?
> A: Yes, sir.
> Q: But, of course, when you conducted their hearing, you held them to the old standard, not the new standard, didn't you?
>          \* \* \*
> A: I held them to the new standard.
>          \* \* \*
> Q: You held them to a standard that didn't exist at the time?
> A: That's correct.
> Q: With regard to the observations contained in the investigative report, I realize you've got to rely on that. You referred to Lieutenant Rosser's [statement]?
> A: Yes, sir.

-4-

Q: Lieutenant Rosser provided a statement as part of the investigation regarding where the baton should be used to strike him, didn't it?

A: Yes, sir.

Q: And in that, he doesn't talk about the upper torso, did he?

A: No.

Q: Okay. Have you since found out – and when I say, "since", that is, since this hearing that you conducted of these officers, that, in fact, strikes to the upper torso are authorized?

A: Yes, sir, I have found it out.

\* \* \*

Q: Okay. Is it a fair statement then, that as a part of your determination to terminate these officers, you were relying on Lieutenant Rosser's representation – at least as you understood them – that there could be no strikes to the upper torso?

A: That's correct.

Q: That was error on Lieutenant Rosser's part, or at least in your understanding of what he's intended?

A: From what I understand now, but at the time I was relying on what –

Q: I understand.

With regard to the departmental policy and procedure in April of 2003 when this incident happened, where is it we could find instructions to officers about the use of the baton?

A: I don't remember it being in the policy, other than – it's not in the policy. We just tell you about the baton. And then, as far as how to use it, it's probably in the training files, rather than in the policy files.

\* \* \*

Q: Chief, I don't want to put words in your mouth, so let me ask it this way: If you had the information then that you have now regarding the training or lack of training or change of training, the policy or change of policy, would you have taken the same action that you took against these officers?

A: With the information that I have received since that time, I may have decided differently.

Q: Okay. When you say you may have decided differently, that means you would not have terminated these officers?

A: That's a possibility.

Thus, Chief Pilot appeared to refer to a change in the excessive force policy and her own misunderstanding as to whether baton strikes to the upper torso were authorized under the policy, noting that police recruits received their information on the use of batons through training, not policy. On redirect, she clarified her testimony:

Q: Chief Pilot, Mr. Hansom [counsel for the police officers] made reference to the change in the policy. Was it a change in the use of a baton or was it a change in the definition of excessive force?

* * *

A: Definition.

* * *

Q: All right. So, in other words, it was not a change in the use of a baton; is that correct?

A: That's correct.

Chief Pilot explained that the change in the definition of "excessive force" merely eliminated the term "unnecessary force," and did not affect the training on the use of a police baton.

Chief Pilot maintained that Officer Schilk's actions could be differentiated from those of the other officers based on the fact that Officer Schilk used the baton as a restraint device across Buckley's back and/or neck to keep Buckley down on the street. She noted that Officer Schilk had admitted that he was not trained to use the baton in that manner. Moreover, Chief Pilot said that her decision to terminate Officer Schilk was based not only on the April 2003 incident, but also on "his disciplinary resume, and his past history."

Chief Pilot acknowledged that, according to the medical examiner's report, Buckley died of natural causes, and that the officers' use of batons did not contribute to his death, other than perhaps to elevate his level of excitement. The medical examiner's report referred to a deep gash in the back of Buckley's head, but did not indicate the cause of the gash. It appears that Chief Pilot did not attribute this wound to the conduct of the Petitioners.

Officers Penny, Schilk, and Tebbetts called no witnesses in their defense at the hearing, nor did they testify. They instead relied on the contents of the investigative file, including their statements, which was entered into evidence as an exhibit. They also relied on the officers' disciplinary records and personnel files, which they indicated were before the Commission.[4] At the conclusion of the hearing, the Commission took the matter under advisement.

On December 16, 2005, the Commission issued its written decision sustaining the termination of Officers Penny, Schilk, and Tebbetts. The Commission made the following findings of fact:

On April 19, 2003, Mr. Penny, Mr. Schilk, and Mr. Tebbetts were dispatched to an "attempt suicide" call at 1115 South Rembert. Mr. Buckley was sitting on the porch, bleeding from multiple self-inflected [sic] cuts about his arms and person. As the

---

[4]Counsel for the officers stated at the Commission hearing: "Mr. Chairman, members of the Commission, the Commission has before it the full investigative file with my clients' statements in there. You have before you their disciplinary records and personnel files."

Police Officers approached, he attempted to reenter his home, at which time the Police Officers attempted to stop him. At this time, a physical altercation occurred between the Police Officers and Mr. Buckley and did not end until Mr. Buckley was handcuffed and subdued on the roadway in front of the residence.

During this altercation, Mr. Buckley was struck numerous times with police batons. In the Police Officers' statements, and confirmed by witnesses on the scene, Mr. Penny, Mr. Schilk, and Mr. Tebbetts stated that they struck Mr. Buckley with their batons as he was attempting to flee from being arrested. Photographs and medical documentation confirm the use of police batons. Photographs and medical documentation also conclude that all of the baton strikes were on Mr. Buckley's upper body.

According to the statements of Police Officers on the scene and witness statements, Mr. Buckley, during the course of the entire altercation, was attempting to flee the control of the Police Officers. At no time did Mr. Buckley directly confront any Police Officer.

At the December 18, 2003, Administrative Hearing, Deputy Chief J. C. Pilot reviewed the investigative report dated November 5, 2003, prepared by the MPD Inspectional Services Bureau, including the written statements of Mr. Penny, Mr. Schilk, Mr. Tebbetts, other Police Officer witnesses, and civilian witnesses. Deputy Chief Pilot then concluded that the conduct of Mr. Penny, Mr. Schilk, and Mr. Tebbetts was a serious violation of DR #301-Excessive Force that justified the harsh discipline of termination.

On August 5, 2005, this Commission received the sworn testimony of Deputy Chief J. C. Pilot and Sergeant Vincent Beasley. This Commission also examined documentary exhibits admitted into evidence, including the November 5, 2003, MPD Inspectional Services Bureau report; the November 20, 2003, Statement of Charges and Administrative Summons; and the December 18, 2003, Administrative Hearing Summary. The Commission also considered the arguments of counsel for the City and for Mr. Penny, Mr. Schilk, and Mr. Tebbetts.

After extensive review of the evidence, after consideration of the arguments of counsel, and after full deliberation, the Commissioners on the hearing panel unanimously agree that the termination of employment of Mr. Penny, Mr. Schilk, and Mr. Tebbetts was reasonable, considering all the facts presented both at the December 18, 2003, Administrative Hearing, and at the August 5, 2005, hearing before this Commission.

Thus, considering the testimony at the hearing, the contents of the investigative file, and other documentary evidence, the Commission upheld the termination of the officers' employment.

On January 20, 2006, the Petitioners filed the instant petition for a writ of certiorari in the trial court below. The petition asserted that the decision of the Commission was "arbitrary, capricious and illegal, and [was] not based upon material, competent, relevant or reliable evidence . . . ." On February 13, 2007, the trial court conducted a hearing on the petition. The record on appeal does not include a transcript of that hearing.

At the conclusion of the hearing, the trial court issued an oral ruling, and the record includes a transcript of the trial court's oral ruling. As to Officers Penny and Tebbetts, the petition for a writ of certiorari was granted, and the City was ordered to reinstate them with backpay and benefits. This decision was based on the fact that Chief Pilot acknowledged that she had relied on the wrong standard in deciding to terminate them, and that the officers "were in a very dense and difficult situation" at the time of the incident. Therefore, the trial court found that the termination of Officers Penny and Tebbetts "was not based on substantial evidence." With respect to Officer Schilk, however, the trial court denied the writ, finding that his termination was not based solely on the incident in question:

> With regard to officer Schilk, on the other hand, the [improper] standard alone was not the basis for the termination, but rather Captain Pilot took into consideration . . . the additional review of his entire personnel file, which she indicated included prior acts where she felt justified in termination.
>     The Court has also reviewed the lay witness statements in this case, and the statements of Officer Schilk, in addition to the entire record and finds that Officer Schilk's conduct clearly went beyond the standards that were either in effect then or after the date of this hearing with regard to the use of the baton. The testimony was that the baton was to be used for clearly – for strictly defensive means and that officer Schilk, based on the witness statements, used it for more than defensive means.

Finding that the termination of Officer Schilk's employment was supported by substantial and material evidence, the trial court denied his petition for a writ of certiorari and upheld his termination.

On March 8, 2007, the trial court entered a final order consistent with its oral ruling. From this order, Officer Schilk now appeals. Notably, the City did not appeal the trial court's decision to reverse the termination of Officers Penny and Tebbetts. Thus, the only issue for our review is whether the trial court erred in upholding the Commission's decision to terminate the employment of Officer Schilk.

On appeal, we utilize the same standard of review used by the trial court in reviewing the Commission's decision. *CF Indus. v. Tenn. Pub. Serv. Comm'n*, 599 S.W.2d 536, 540 (Tenn. 1980). Under the applicable statute, a reviewing court may reverse the decision of the Commission only if the administrative findings or conclusions are:

> (1) In violation of constitutional or statutory provisions;

(2) In excess of the statutory authority of the agency;

(3) Made upon unlawful procedure;

(4) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or

(5)(A) Unsupported by evidence that is both substantial and material in the light of the entire record.

(B) In determining the substantiality of evidence, the court shall take into account whatever in the record fairly detracts from its weight, but the court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact.

T.C.A. § 4-5-322(h) (2005); *see* T.C.A. § 27-9-114(b)(1) (2000) (providing that decisions by the City affecting employment status must be reviewed under the section 4-5-322 standard).

On questions of law, our review is *de novo* with no presumption of correctness. ***Bowden v. Ward***, 27 S.W.3d 913, 916 (Tenn. 2000); Tenn. R. App. P. 13(d). Once it is determined that the Commission employed the proper legal principles, we must consider the disputed findings of fact under a "substantial and material evidence" standard. ***City of Memphis v. Civil Serv. Comm'n***, 238 S.W.3d 238, 243 (Tenn. Ct. App. 2007). "Substantial and material evidence is 'such relevant evidence as a reasonable mind might accept to support a rational conclusion' and to furnish a reasonably sound basis for the decision under consideration." ***Id.*** (quoting ***City of Memphis v. Civil Serv. Comm'n***, 216 S.W.3d 311, 316 (Tenn. 2007) (quoting ***Jackson Mobilphone Co. v. Tenn. Pub. Serv. Comm'n***, 876 S.W.2d 106, 110-11 (Tenn. Ct. App. 1993))). It has also been described as "something less than a preponderance of the evidence, but more than a scintilla or glimmer." ***Wayne County v. Tenn. Solid Waste Disposal Control Bd.***, 756 S.W.2d 274, 280 (Tenn. Ct. App. 1988) (citations omitted). According to the plain language in the statute, in determining the "substantiality" of the evidence, this Court may consider evidence in the record that fairly detracts from its weight, but we are not to substitute our judgment for that of the agency concerning the weight of the evidence. T.C.A. § 4-5-322(h)(5)(B); ***Pace v. Garbage Disposal Dist.***, 390 S.W.2d 461, 463 (Tenn. Ct. App. 1965). Rather, we must review the administrative record to determine whether the agency's decision was based on the sort of relevant evidence that a reasonable mind might accept as adequate to support a rational conclusion or to furnish a reasonably sound basis for the action under consideration. ***Southern Ry. Co. v. State Bd. of Equalization***, 682 S.W.2d 196, 199 (Tenn. 1984); *see Pace*, 390 S.W.2d at 463. We may consider only the materials in the administrative record in considering whether an agency's decision is supported by substantial and material evidence. T.C.A. § 4-5-322(g).

Under the Memphis City Charter, a police officer may be terminated by the City for "just cause," which "shall exist when the employer had a reasonable basis for the action taken." Memphis City Charter § 246. In this case, Officer Schilk was terminated based on his use of excessive force in violation of DR-301. Based on the evidence in the administrative record and the testimony presented at the hearing, the Commission found that the City had a reasonable basis for the termination of Officer Schilk's employment for using excessive force in violation of DR-301.

In this appeal, Officer Schilk argues vigorously that the Commission's decision was arbitrary and capricious, and that it was not supported by substantial and material evidence. He claims that the Commission disregarded compelling evidence that militated against the City's decision, and that it relied on trivial and unrelated information to support the decision to terminate him. Officer Schilk indicates that much evidence in the record showed that Buckley was swinging at him and the other officers and resisting arrest, and that they were using their batons on Buckley as a defensive measure. He notes that it was undisputed that Buckley was acting irrationally and that all verbal efforts to calm him were unsuccessful. The evidence in the record showed that the officers knew that Buckley had used a knife on himself, and that they needed to subdue him to prevent him from going back into his house to retrieve the knife or any other weapon. Even if the officers did not need to use the batons to defend themselves, Officer Schilk contends, the batons were necessary to get control of Buckley, who might have harmed himself further or harmed others. He claims that the record does not contain substantial and material evidence showing that using the batons for this purpose was improper. He cites to Sergeant Beasley's testimony, which he contends indicates that a baton may be used in circumstances other than as a defensive weapon. Moreover, Officer Schilk refers to Chief Pilot's admission that the officers were terminated for violating a policy that did not yet exist at the time of the incident, and that she might have decided differently had she had the correct information. Thus, Officer Schilk argues, he was terminated for violating a policy that he could not have known existed at the time of the incident. Officer Schilk notes that in distinguishing Officer Schilk's termination from the termination of Officers Penny and Tebbetts, Chief Pilot relied on Officer Schilk's disciplinary resume and "past history;" however, he claims, his personnel file was not provided to the Commission or made a part of the administrative record. For all these reasons, Officer Schilk maintains, the Commission's decision was arbitrary and was not supported by substantial and material evidence.

We first address Officer Schilk's contention that there is not substantial and material evidence to support the Commission's factual finding that, "[a]t no time did Mr. Buckley directly confront any Police Officer." As noted by Officer Schilk, the statements given by him and by Officers Penny and Tebbetts indicated that Buckley was coming at the police officers, attempting to hit them, necessitating the use of the batons. The statements by other witnesses, however, including neighbors, paramedics on the scene, and bystanders, indicated that Buckley did not attack the officers, but was instead attempting to push past them and resist their efforts to restrain him. We are not bound by the Commission's findings based on the assessment of this evidence, because there was no *viva voce* testimony from these witnesses before the Commission. We still consider this evidence, however, in weighing the substantiality of the basis for the Commission's decision. ***See Reese v. Tenn. Civil Serv. Comm'n***, 699 S.W.2d 808, 811-12 (Tenn. Ct. App. 1985). In light of the evidence, we must conclude that there is substantial and material evidence to support the Commission's conclusion that "[a]t no time did Mr. Buckley directly confront any Police Officer."

Officer Schilk has identified evidence that fairly detracts from the weight of the evidence supporting his termination. He relies to a great extent on Chief Pilot's newfound lack of certainty about her decision to terminate. Certainly Chief Pilot conceded that she was operating under a misconception at the time that she made the decision to terminate all three officers, that she learned

that baton strikes to the upper torso were not unauthorized, and that this affected her overall decision. Chief Pilot clarified, however, that the change was not in the use of a baton. More importantly, she noted that Officer Schilk, in addition to using his baton on Buckley's upper torso, used it on Buckley's back shoulder or neck area as a restraint device. She maintained that Lieutenant Rosser of the police training academy indicated that recruits are not trained to use a baton in such a manner, and that Officer Schilk admitted as much. The trial court, in its review of the Commission's decision, found that "Officer Schilk's conduct clearly went beyond the standards that were either in effect then or after the date of this hearing with regard to the use of the baton."

Chief Pilot also testified that Officer Schilk's termination was based not only on the incident involving Buckley, but also on "his disciplinary resume, and his past history." This fact was relied upon by the trial court as well. Though counsel for the Petitioners drew the Commission's attention to his clients' "disciplinary records and personnel files," referring to them as being "before" the Commission, the personnel files and disciplinary records are not in the record on appeal and Officer Schilk now asserts that his disciplinary record "was not part of the record nor provided to the Commission for purposes of considering the adequacy of the termination." Regardless, Chief Pilot's testimony is unrefuted that (1) she reviewed Officer Schilk's disciplinary record in considering the charges against him arising out of the Buckley incident, (2) Officer Schilk's disciplinary record militated in favor of termination, and (3) Chief Pilot relied in part on Officer Schilk's disciplinary record in deciding to terminate his employment.

In light of this, we review the record as a whole to determine whether the Commission's decision was supported by substantial and material evidence, or whether it was arbitrary and capricious. The record indicates that Buckley was a mental patient who had cut himself extensively in an apparent attempt to commit suicide. When the officers arrived at the scene, they were aware that Buckley no longer had a knife and made a reasonable decision that Buckley should not be permitted to re-enter the home and obtain a knife or other weapon. A struggle ensued in which Buckley mightily resisted the officers' efforts to restrain him, but did not "directly confront" the officers. The officers' efforts at this point included baton blows to Buckley's torso.

After Buckley broke free and left the porch, there was not an immediate danger that he would acquire a weapon, but nonetheless he was irrational and presented a danger. After Buckley tripped and fell in the street, the officers, including Officer Schilk, continued to rain baton blows upon him in an effort to subdue him as he lay face down in the street. In addition, Officer Schilk used his baton as a restraining device, placing it across Buckley's shoulders or neck area to hold him down. Officer Schilk was not trained to use his baton in such a manner. The actions of Officer Schilk and the other Officers, while contributing to Buckley's level of excitement and agitation, did not directly cause his death.

Based on this evidence, the Commission found that Officer Schilk's use of force under these circumstances was excessive and that it warranted termination. Given our standard of review, "[w]e cannot reverse an agency determination simply because the evidence also supports another conclusion." *City of Memphis v. Civil Serv. Comm'n*, 239 S.W.3d 202, 211 (Tenn. Ct. App. 2007).

We find that substantial and material evidence supports the Commission's decision and its decision was not arbitrary and capricious. Therefore, we must affirm the trial court's decision to deny Officer Schilk's petition and uphold his termination.

The decision of the trial court is affirmed. Costs on appeal are to be taxed to Appellant Kurtis Schilk and his surety, for which execution may issue, if necessary.

_____

HOLLY M. KIRBY, JUDGE