FILED

01/13/2017

Clerk of the
Appellate Courts


## IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON
### November 17, 2016 Session

## JERRY HOLMES v. CITY OF MEMPHIS CIVIL SERVICE COMMISSION

**Appeal from the Chancery Court for Shelby County**
**No. CH-13-0507     Walter L. Evans, Chancellor**

_____

**No. W2016-00590-COA-R3-CV**

_____

An employee of the Memphis Fire Department was terminated following his involvement in a physical altercation in which he struck a business associate in the face with a hammer. The City of Memphis Civil Service Commission upheld the termination, and the employee filed a petition for judicial review. The chancery court reversed the termination, holding that the Civil Service Commission erred in not allowing the employee the benefit of Tennessee's self-defense statute, in excluding certain evidence of disparate treatment, and in entering a decision not supported by substantial and material evidence. Having reviewed the record, we reverse the judgment of the chancery court in all respects and remand the case for such further proceedings as are necessary and consistent with this opinion.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Reversed and Remanded**

ARNOLD B. GOLDIN, J., delivered the opinion of the Court, in which J. STEVEN STAFFORD, P.J., W.S., and KENNY ARMSTRONG, J., joined.

Bruce McMullen and Zayid A. Saleem, Memphis, Tennessee, for the appellant, City of Memphis Civil Service Commission.

Darrell J. O'Neal, Memphis, Tennessee, for the appellee, Jerry Holmes.

## OPINION

### I. BACKGROUND AND PROCEDURAL HISTORY

Jerry Holmes had been employed by the Memphis Fire Department for 20 years when he was involved in a physical altercation at his home with Leon Bosby, a former

business associate, on June 4, 2009. On that date, Mr. Bosby, accompanied by his five-year-old son, drove to Mr. Holmes's house to pay $500 of a $4,000 debt he owed Mr. Holmes from an earlier transaction. When they arrived, Mr. Holmes invited Mr. Bosby and Mr. Bosby's son into his house to discuss Mr. Bosby's payment of the remaining debt. The discussion became heated when Mr. Holmes asked Mr. Bosby to sign two receipts as evidence of the remaining debt. Although Mr. Holmes and Mr. Bosby subsequently gave conflicting accounts of the events that followed, it is undisputed that a physical altercation ensued during which Mr. Holmes struck Mr. Bosby in the face with a hammer. Bleeding profusely, Mr. Bosby returned to his vehicle and left Mr. Holmes's house with his son. After driving a short distance, Mr. Bosby flagged down a police officer and reported that he had been attacked by Mr. Holmes. In the meantime, Mr. Holmes called 911 and reported that he had been attacked by Mr. Bosby. Several police officers arrived at Mr. Holmes's house shortly thereafter to investigate the matter. After completing their investigation, the officers arrested Mr. Holmes and charged him with aggravated assault.

Due to the serious nature of the charges against Mr. Holmes, the Memphis Fire Department requested an investigation of the incident. The Memphis Police Department's Inspectional Services Bureau conducted the investigation and prepared a report detailing its findings. The report contained, among other things, Mr. Holmes's and Mr. Bosby's accounts of the incident. In his statement to investigators, Mr. Bosby maintained that he was trying to leave the house with his son when Mr. Holmes attacked him from behind. Mr. Bosby stated that he never touched Mr. Holmes prior to the attack. Mr. Holmes, on the other hand, admitted to striking Mr. Bosby with a hammer but maintained that he did so in self-defense. Police reports included in the investigative report reflected the responding officers' determination that the evidence at the scene supported Mr. Bosby's account of the events.

Shortly thereafter, the City of Memphis (the "City") charged Mr. Holmes with violating the following disciplinary rules:

**Division of Fire Services Operations Manual, Volume 100, Rules and Regulations**

Section 102.01, Page 2, Regulation 9
Members shall not exhibit conduct either on duty or off duty that is in breach of public trust.

Section 102.01, Page 2, Regulation 10
Members shall not exhibit conduct, either on duty or off duty that could be considered unbecoming a member of the Fire Division or City of Memphis.

<u>Section 103.01, Page 3, General Provision 11 (Major Violations)</u>

g) Disruption of work.

r) Arrest, incarceration or conviction of a criminal offense whether misdemeanor or felony.

s) Conduct unbecoming a member of the Memphis Fire Department or City of Memphis.

**<u>City of Memphis Personnel Manual</u>**

<u>PM 62-12, Section 62-00, Page 1, Paragraph 1</u>
City employees, as integral members of City of Memphis Government, shall adhere to acceptable business principles in matters of personal conduct and behavior and exhibit a high degree of personal integrity. This not only involves respect for the rights and feelings of other City employees, but demands that City employees refrain from any conduct or behavior that is criminal or illegal, or that might be personally harmful to coworkers and City of Memphis Government, or that could be viewed unfavorably by the public at large.

<u>PM 62-12, Section 62-00, Page 1, Paragraph 4</u>
City of Memphis Government employees are required to accept assigned job responsibilities, adhere to rules of conduct at all times, and shall not commit criminal or illegal acts against the City of Memphis, other City employees, or the public at large. Violation of this policy shall subject City employees to disciplinary action up to and including termination and/or possible criminal prosecution for either a criminal or illegal act.

Deputy Chief Daryl Payton conducted a pre-termination hearing on February 17, 2010. Mr. Holmes was present at the hearing and spoke on his own behalf. Deputy Chief Payton sustained the charges against Mr. Holmes and terminated his employment with the City. Mr. Holmes then appealed his termination to the Civil Service Commission (the "Commission") in accordance with the City's charter.

The Commission conducted a hearing on the matter over the course of two days in January 2013.[1] The Commission addressed several preliminary matters at the outset of

---

[1] Mr. Holmes requested that the Commission hold the matter in abeyance pending the resolution of his legal matters.

the hearing. In response to a pre-hearing motion filed by Mr. Holmes, the Commission ruled that it would not consider any reference to Mr. Holmes's arrest or to the criminal proceedings against Mr. Holmes as a result of the altercation as those charges had been dismissed and expunged.

Mr. Bosby testified first before the Commission. Throughout his testimony, Mr. Bosby maintained that Mr. Holmes had been the primary aggressor in the altercation. According to Mr. Bosby, Mr. Holmes became upset that Mr. Bosby was unsure when he would be able to repay the remaining balance of his debt. Hoping to avoid further confrontation, Mr. Bosby told his son it was time to leave, and they exited the house. As Mr. Bosby and his son were walking down the driveway with their backs to Mr. Holmes, Mr. Holmes struck Mr. Bosby in the back of the head with his fist. When Mr. Bosby turned around, Mr. Holmes pulled a gun out of the waistband of his pants, and Mr. Bosby told his son to get in the vehicle. While Mr. Bosby was turned towards his son, Mr. Holmes struck him in the back of the head with the gun. Mr. Holmes then pulled a hammer from the back of his truck and struck Mr. Bosby in the face with it. Mr. Bosby fell to a knee, and Mr. Holmes struck him again on the shoulder with the hammer. Mr. Bosby testified that as a result of being hit with the hammer, he suffered a cut on his nose requiring stitches, a broken jaw, and bruising to the back of his shoulder. He also testified that he suffered a mild concussion from being hit in the back of the head with the gun. The City sought to introduce photographs of Mr. Bosby's injuries during his testimony, but Mr. Holmes objected on the grounds that they had not been considered in his pre-termination hearing. The Commission sustained the objection and did not consider the photographs in reaching its decision.

Mr. Holmes testified next, presenting a strikingly different account of the altercation. Mr. Holmes testified that he never had a gun in his possession during the altercation and that he swung the hammer at Mr. Bosby in self-defense. According to Mr. Holmes, the two were discussing Mr. Bosby's debt in Mr. Holmes's garage when Mr. Bosby became angry and pushed Mr. Holmes, causing him to fall. Mr. Bosby then started kicking Mr. Holmes in the stomach, and Mr. Holmes managed to push Mr. Bosby away long enough to grab the hammer from a nearby shelf. Mr. Holmes swung the hammer at Mr. Bosby several times and was unsure whether he actually hit Mr. Bosby with the hammer until he saw Mr. Bosby turn and run back to his vehicle with blood on his face. Mr. Holmes acknowledged that he did not suffer any observable physical injuries or seek medical treatment following the altercation. Nevertheless, he maintained that he was in fear for his life during the incident.

Sheriff's Deputy Michelle Hall was the first officer to arrive at Mr. Holmes's house after the altercation. Deputy Hall testified that she observed Mr. Bosby, who returned to the house shortly thereafter with the officer he had flagged down, bleeding

from a laceration on his nose. She testified that Mr. Holmes "wasn't disheveled at all" and did not appear to have been involved in a physical altercation. She also testified that officers recovered a gun from Mr. Holmes's house and that she observed blood near the end of Mr. Holmes's driveway.

Detective Nathan Cockman arrived at the house shortly after Deputy Hall. Detective Cockman testified that he observed droplets of blood towards the end of Mr. Holmes's driveway and in the road. He did not observe any blood in Mr. Holmes's garage. On cross-examination, however, Detective Cockman acknowledged that the location of the blood was not necessarily indicative of where the altercation took place.

The Commission also heard testimony from Deputy Chief Payton, who made the decision to fire Mr. Holmes. Deputy Chief Payton testified that, in making the decision, he considered the police department's investigative report and Mr. Holmes's statements in the pre-termination hearing. He explained that evidence outlined in the investigative report contradicted Mr. Holmes's claims of self-defense and more strongly supported a finding that he was the primary aggressor in the altercation. Deputy Chief Payton acknowledged Mr. Holmes's good disciplinary record prior to the incident but explained that the circumstances–namely, Mr. Holmes's use of a deadly weapon, the physical evidence contradicting Mr. Holmes's account of the altercation, and the presence of Mr. Bosby's son–warranted termination. On cross-examination, Mr. Holmes's counsel questioned Deputy Chief Payton at length about disciplinary proceedings involving other fire department employees. Deputy Chief Payton acknowledged that other fire department employees had been charged with violating the same disciplinary rules without being terminated. To the extent that he was familiar with the circumstances of those matters, however, he testified that they were distinguishable because they did not involve the use of a deadly weapon.

After the City concluded its proof, Mr. Holmes sought to present the testimony of Maurice Jones–a fire department employee who he argued received less severe punishment for similar conduct. The City objected to Mr. Jones's testimony on the grounds that he had resolved his disciplinary matter by entering into a confidential settlement agreement with the City. The City's counsel explained that, pursuant to the settlement agreement's forfeiture provision, Mr. Jones would lose the benefits he received under the agreement by testifying. In response, Mr. Holmes argued that settlement agreements with a public entity are not confidential because they are subject to disclosure as public records. Mr. Holmes also sought to present the testimony of Tim Austin–another fire department employee who he argued received less severe punishment for similar conduct. As it had done with regard to Mr. Jones, the City objected to Mr. Austin's testimony on the grounds that he had resolved his disciplinary matter by entering into a settlement agreement with the City. The Commission sustained the City's

objections to the testimony of both Mr. Jones and Mr. Austin. The Commission admitted the settlement agreements entered into by both men under seal but ruled that it would not consider them in making its decision.

On March 11, 2013, the Commission issued a written decision upholding Mr. Holmes's termination. The Commission found that the rules and regulations cited in terminating Mr. Holmes were in effect and binding on him on the date of the altercation. The Commission found that Mr. Holmes's conduct towards Mr. Bosby during the altercation "constituted a breach of public trust," "conduct unbecoming a member of MFD and an employee of the City," and "illegal conduct or behavior that could be viewed unfavorably by the public at large." Additionally, the Commission found that the case was distinguishable from others advanced as evidence of disparate conduct because the other cases "did not involve the corroborating testimony of a complaining victim, did not involve the serious personal physical injuries presented in this case, and therefore did not [involve] similar facts for the determination of appropriate discipline."

Mr. Holmes timely filed a petition for judicial review in the Shelby County Chancery Court. In the petition, Mr. Holmes asserted that (1) the City violated his equal protection rights by applying its policies disparately towards him and the Commission erred by refusing to allow him the opportunity to present additional evidence of disparate treatment, (2) the Commission erred in failing to allow him the benefit of Tennessee's self-defense statute, (3) the Commission erred in considering evidence not considered by the investigative committee in terminating his employment, and (4) the Commission erred in admitting evidence of his arrest when the charges against him were dismissed before trial and expunged from his record. Mr. Holmes asked the court to reverse the Commission's decision, enter an order requiring the City to reinstate him with back pay and benefits, and award him a judgment for attorney's fees and costs.

Following a hearing, the chancery court entered an order reversing the Commission's decision in July 2015. The court determined that the Commission erred in failing to allow Mr. Holmes the benefit of Tennessee's self-defense statute and in refusing to consider relevant evidence of disparate treatment regarding Mr. Austin and Mr. Jones. Additionally, the court determined that the Commission's decision was not supported by substantial and material evidence because it refused to consider Mr. Holmes's long-term service with the City, his disciplinary history, and the discipline of similarly situated employees. In light of those errors, the court ordered that the matter be remanded to the Commission for further proceedings.

The City timely filed a notice of appeal from the chancery court's decision, but this Court dismissed the appeal based on its determination that the order appealed from was not final. In doing so, this Court explained that there was nothing in the record to

reflect that the chancery court adjudicated Mr. Holmes's claims for back pay, benefits, and attorney's fees. In February 2016, the chancery court entered an amended judgment ordering Mr. Holmes's reinstatement with back pay and benefits and awarding Mr. Holmes $90,000 in attorney's fees. Thereafter, the City timely filed a second notice of appeal to this Court.

## II. ISSUES

The City raises the following issues on appeal, restated from its appellate brief:

1. Whether the trial court erred in holding that the Commission should have allowed Mr. Holmes the benefit of Tennessee's self-defense statute.

2. Whether the trial court erred in holding that the Commission should have considered evidence of disparate treatment regarding Tim Austin and Maurice Jones.

3. Whether the trial court erred in exceeding the scope of its review and improperly substituting its own judgment for that of the Commission.

4. Whether the trial court erred in holding that the Commission's decision was not supported by substantial and material evidence.

## III. STANDARD OF REVIEW

Judicial review of administrative agency decisions is governed by statute in both the trial and appellate courts. Tenn. Code Ann. § 27-9-114(b)(1); *Davis v. Shelby Cnty. Sheriff's Dep't*, 278 S.W.3d 256, 264 (Tenn. 2009). The Uniform Administrative Procedures Act sets forth the limited scope of judicial review:

(h) The court may affirm the decision of the agency or remand the case for further proceedings. The court may reverse or modify the decision if the rights of the petitioner have been prejudiced because the administrative findings, inferences, conclusions or decisions are:

(1) In violation of constitutional or statutory provisions;

(2) In excess of the statutory authority of the agency;

(3) Made upon unlawful procedure;

(4) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or

(5)(A) Unsupported by evidence that is both substantial and material in the light of the entire record.

(B) In determining the substantiality of evidence, the court shall take into account whatever in the record fairly detracts from its weight, but the court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact.

Tenn. Code Ann. § 4-5-322(h).

The narrow standard of review set forth in that statute reflects the general principle that the courts should defer to the decisions of administrative agencies when they act within their area of specialized knowledge, experience, and expertise. *StarLink Logistics Inc. v. ACC, LLC*, 494 S.W.3d 659, 669 (Tenn. 2016). While we still review questions of law de novo with no presumption of correctness, we consider the Commission's resolution of factual issues using a "substantial and material evidence" standard. *Penny v. City of Memphis*, 276 S.W.3d 410, 417-18 (Tenn. Ct. App. 2008). Generally, the courts have interpreted the substantial and material evidence standard as requiring "something less than a preponderance of the evidence, but more than a scintilla or glimmer." *Dickson v. City of Memphis Civil Serv. Comm'n*, 194 S.W.3d 457, 464 (Tenn. Ct. App. 2005) (quoting *Wayne Cnty. v. Tenn. Solid Waste Disposal Control Bd.*, 756 S.W.2d 274, 280 (Tenn. Ct. App. 1988)). The evidence before the Commission must be "such relevant evidence as a reasonable mind might accept as adequate to support the rational conclusion and such as to furnish a reasonably sound basis for the actions under consideration." *Id.* As directed by the statute, we may take into account whatever in the record fairly detracts from the weight of the evidence, but we may not substitute our own judgment for that of the Commission by re-weighing the evidence. Tenn. Code Ann. § 4-5-322(h)(5)(B). To that end, when the Commission conducts a hearing and can evaluate the witnesses as they testify, we must afford great weight to its credibility determinations. *Hoback v. City of Chattanooga*, 492 S.W.3d 248, 258 (Tenn. Ct. App. 2015).

## IV. DISCUSSION

In reversing the Commission's decision, the chancery court relied on three of the grounds for reversal listed in Tennessee Code Annotated section 4-5-322(h). Specifically, the chancery court concluded that (1) the Commission's decision was made in violation of constitutional or statutory provisions, (2) the Commission's decision was arbitrary and capricious, and (3) the Commission's decision was unsupported by

substantial and material evidence. The City challenges each of those conclusions and submits that the chancery court improperly substituted its judgment for that of the Commission. We will discuss each of the grounds for reversal separately.

## A. Violation of Constitutional or Statutory Provisions

The chancery court determined that the Commission's decision was made in violation of applicable statutory provisions because it failed to allow Mr. Holmes the benefit of Tennessee's self-defense statute. *See* Tenn. Code Ann. § 39-11-611(b).[2] The chancery court explained that because consistent portions of Mr. Holmes's and Mr. Bosby's testimony suggested that Mr. Holmes may have reasonably believed that force was immediately necessary to protect himself from Mr. Bosby, the larger of the two men,[3] during the course of an argument in Mr. Holmes's house, the Commission should have allowed Mr. Holmes the benefit of the statute.

On appeal, the City contends that the chancery court's ruling was erroneous because the self-defense statute is not relevant in this context. As the City correctly points out, this Court addressed this issue in *Logan v. Civil Service Commission of the City of Memphis*, No. W2007-00324-COA-R3-CV, 2008 WL 715226 (Tenn. Ct. App. Mar. 18, 2008). That case involved a police officer who was terminated for violating the police department's deadly force policy when he shot his girlfriend's husband in the back

---

[2] Tennessee Code Annotated § 39-11-611(b) provides in relevant part:

> (b)(1) Notwithstanding § 39-17-1322, a person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force against another person when and to the degree the person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force.

> (2) Notwithstanding § 39-17-1322, a person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force intended or likely to cause death or serious bodily injury, if:

> (A) The person has a reasonable belief that there is an imminent danger of death or serious bodily injury;

> (B) The danger creating the belief of imminent death or serious bodily injury is real, or honestly believed to be real at the time; and

> (C) The belief of danger is founded upon reasonable grounds.

[3] According to the record on appeal, at the time of the altercation, Mr. Bosby was six feet, two inches tall and weighed 275 pounds while Mr. Holmes was six feet, one inch tall and weighed 225 pounds.

during an altercation at her mother's apartment. *Id*. at *1. The Commission upheld the officer's termination. *Id*. at *3-4. On appeal, the officer argued, among other things, that the Commission erred in failing to consider the self-defense statute. *Id*. at *9. This Court rejected his argument, stating:

> We first note that the Commission was required to determine whether Sergeant Logan violated the Department's deadly force policy and whether there was a reasonable basis for terminating his employment. The statutes he cites pertain to criminal prosecutions, not to the termination of public employment. Were he on trial for a criminal offense, these provisions would certainly become relevant.

*Id*. at *10. Relying on *Logan*, the City asserts that Tennessee's self-defense statute is not relevant in the context of an employee disciplinary proceeding.

For his part, Mr. Holmes contends that this Court reversed course from its holding in *Logan* with its more recent opinion in *Small v. Memphis-Shelby County Airport Authority*, No. W2015-01090-COA-R3-CV, 2016 WL 3977111 (Tenn. Ct. App. July 20, 2016), *perm. app. denied, not for citation* (Tenn. Dec. 15, 2016). In *Small*, the airport authority placed an officer on leave pending her completion of a fitness for duty evaluation and scheduled an appointment for a psychological examination on the officer's behalf. *Id*. at *3-4. At the appointment, the officer informed the doctor that she intended to record the interview portion of her evaluation. *Id*. The doctor refused to be recorded and postponed the interview until she could contact the airport authority about how to proceed. *Id*. Rather than instruct the doctor on how to proceed, the airport authority terminated the officer for insubordination based on her failure to complete the evaluation, and the Commission sustained the termination. *Id*. at *4-5. This Court reversed on appeal, holding that the Commission's decision was not supported by substantial and material evidence. *Id*. at *9. In doing so, the Court noted that the officer could have lawfully recorded the interview without the doctor's consent pursuant to Tennessee Code Annotated section 39-13-601(a)(5), which provides an exception to criminal penalties for such recordings under the Tennessee Wiretap Act. *Id*. at *8. Relying on *Small*, Mr. Holmes argues that public employees are entitled to rely on the protection of a criminal statute in disciplinary proceedings.

Mr. Holmes's reliance on *Small* is misplaced.[4] In *Small*, the Court simply noted that the officer could have lawfully recorded the interview without the doctor's consent

---

[4]Subsequent to oral argument in this case, the Tennessee Supreme Court denied an application for permission to appeal in *Small* with a "Not for Citation" designation. As such, this Court's opinion in *Small* has no precedential value. Tenn. Sup. Ct. R. 4(E). In any event, we conclude that *Small* is

as further support for its determination that the record did not contain sufficient evidence of her insubordination. The issue in this case is not whether Mr. Holmes *could have* lawfully used force in self-defense during the altercation with Mr. Bosby. Rather, the issue is whether Mr. Holmes *actually did* use force in self-defense during the altercation. In its decision, the Commission stated, "Mr. Holmes admitted that he had struck Mr. Bosby with a hammer; however, Mr. Holmes alleged that he was acting in self-defense." The Commission was fully apprised of Mr. Holmes's claim that he acted in self-defense during the altercation and simply afforded more weight to the evidence supporting Mr. Bosby's account of the altercation. The Tennessee self-defense statute was in no way relevant to the Commission's resolution of that factual dispute. The chancery court therefore erred in ruling that the Commission violated a statutory provision by failing to give Mr. Holmes the benefit of the self-defense statute.

## B. Arbitrary and Capricious

The chancery court determined that the Commission's decision was arbitrary and capricious because it excluded evidence of disparate treatment regarding Mr. Austin and Mr. Jones. The court ruled that the Commission erred in excluding the evidence based on the confidentiality of their settlement agreements with the City because settlement agreements with a governmental entity are subject to disclosure as public records and are, therefore, not confidential. *See Friedmann v. Corr. Corp. of Am.*, No. M2012-00212-COA-R3-CV, 2013 WL 784584, at *5 (Tenn. Ct. App. Feb. 28, 2013). The court explained that because it excluded the evidence, the Commission had no way of knowing whether Mr. Austin and Mr. Jones were "similarly situated" to Mr. Holmes and reasoned that such an error of judgment rendered its decision arbitrary and capricious.

The City acknowledges on appeal that settlement agreements with a governmental entity are subject to disclosure as public records. Nevertheless, the City argues that the Commission's decision to exclude evidence of disparate treatment regarding Mr. Austin and Mr. Jones did not render its decision arbitrary and capricious because such evidence would not have been material. In advancing this argument, the City relies on this Court's opinion in *Echols v. City of Memphis*, No. W2013-00410-COA-R3-CV, 2013 WL 5230251 (Tenn. Ct. App. Sept. 16, 2013). In that case, the police department terminated an officer after finding that he violated its rules by obtaining secondary employment with a private security company. *Id*. at *1. The Commission sustained the termination, and the officer filed a petition for judicial review. *Id*. In the trial court, the officer sought to introduce evidence that he was treated differently than another officer charged with the same offense and that the disparate treatment violated his equal protection rights. *Id*. The trial court denied the officer's request, and this Court affirmed. *Id*. at *3-4. Relying

distinguishable from the present case for the reasons explained herein.

- 11 -

on the United States Supreme Court's decision in *Engquist v. Oregon Department of Agriculture*, 553 U.S. 591 (2008), this Court held that equal protection claims must be founded on an assertion that the claimant has been treated differently because of his or her membership in a suspect class (e.g., race, gender, national origin). *Id*. at \*3. The Court explained that by merely arguing that he was intentionally treated differently from another officer for no apparent reason, the officer brought a "class-of-one" equal protection claim not applicable in the public employment context. *Id*. The Court concluded that because the officer's equal protection claim was destined to fail, the additional evidence that he sought to introduce was not material. *Id*. at \*4. The City argues that, like the officer in *Echols*, Mr. Holmes has not asserted that he was treated differently than Mr. Austin or Mr. Jones based on his membership in a suspect class. The City therefore submits that his equal protection claim was destined to fail, and the additional evidence that he sought to introduce regarding Mr. Austin and Mr. Jones was not material.

In response, Mr. Holmes submits that the City's reliance on *Echols* is an "irrelevant diversion." Mr. Holmes contends that his disparate treatment argument is not based on constitutional equal protection but on the City's internal policy requiring fair and equal treatment of its employees. He argues that the Commission was legally obliged to hear and consider evidence of disparate treatment if it was presented and, in support of that argument, cites this Court's opinions in three cases: *Mack v. Civil Service Commission of the City of Memphis*, No. 02A01-9807-CH-00215, 1999 WL 250180 (Tenn. Ct. App. Apr. 28, 1999), *City of Memphis v. Cattron*, No. W2010-01659-COA-R3-CV, 2011 WL 1902167 (Tenn. Ct. App. May 13, 2011), and *Barrom v. City of Memphis Civil Service Commission*, No. W2011-01248-COA-R3-CV, 2011 WL 5420365 (Tenn. Ct. App. Nov. 9, 2011). In *Mack*, two park commission employees disobeyed their supervisor by leaving an event early; one was not disciplined in any manner, but the other was terminated. *Mack*, 1999 WL 250180, at \*1. The Commission and the trial court both upheld the termination without addressing the terminated employee's equal protection argument. *Id*. at \*5. On appeal, this Court held that the terminated employee was entitled to have the equal protection argument addressed by the trial court. *Id*. at \*6. In *Cattron*, the city terminated a police dispatcher for cancelling a 911 call. *Cattron*, 2011 WL 1902167, at \*1. The Commission reversed the termination, relying in part on evidence that other dispatchers had received lesser punishment for similar violations. *Id*. at \*2-3. The City argued on appeal that the other cases were factually distinguishable. *Id*. at \*6. This Court upheld the Commission's decision, holding that the Commission was fully aware of the facts of those cases and was simply not persuaded by their distinguishing elements. *Id*. In *Barrom*, a police officer was terminated for his involvement in a physical altercation with a parking lot attendant, and the Commission upheld the termination. *Barrom*, 2011 WL 5420365, at \*1. On appeal to the trial court, the dispatcher sought to introduce evidence that the police department violated his equal

- 12 -

protection rights because other officers had received lesser punishment for similar offenses. *Id*. The trial court denied the request, but this Court reversed, holding that the officer should have been permitted to present the evidence in support of his equal protection claim. *Id*. at *4-5. Mr. Holmes contends that the foregoing cases demonstrate that he should have been permitted to present additional evidence of disparate treatment regarding Mr. Austin and Mr. Jones.

As an initial matter, we note that each of the cases cited by Mr. Holmes preceded *Echols*. More importantly, none of them specifically addresses the issue analyzed in *Echols*: whether evidence intended to establish a violation of equal protection in the public employment context is material without an assertion that the different treatment was based on the employee's membership in a suspect class. The *Echols* Court held that such evidence is not material, and its reasoning is sound. Governments are charged with functioning as effectively and efficiently as possible. *Engquist*, 553 U.S. at 598. They would not be able to carry out that function if every personnel decision became a constitutional matter. *Echols*, 2013 WL 5230251, at *3 (quoting *Engquist*, 553 U.S. at 607). Moreover, government employment decisions, like all others, "are quite often subjective and individualized, resting on a wide array of factors that are difficult to articulate and quantify." *Id*. at *3 (quoting *Engquist*, 553 U.S. at 604). "To treat employees differently is not to classify them in a way that raises equal protection concerns. Rather, it is simply to exercise the broad discretion that typically characterizes the employer-employee relationship." *Id.* (quoting *Engquist*, 553 U.S. at 605). While equal protection is still implicated when a public employer makes a class-based decision by treating a suspect class of employees categorically differently than other, similarly situated employees, it does not apply when, as here, the public employer is alleged to have made an individualized, subjective personnel decision in a seemingly arbitrary manner. *See Engquist*, 553 U.S. at 605. As such, it makes sense to consider evidence intended to show disparate treatment violating equal protection only insofar as it is based on discrimination against a suspect class. Because Mr. Holmes has never asserted that he was treated differently that Mr. Austin or Mr. Jones based on his membership in a suspect class, evidence that they were treated differently than he was treated was not material to his equal protection claim.

With regard to Mr. Holmes's argument that *Echols* is inapplicable because his disparate treatment argument is based on violation of the City's policy requiring fair and equal treatment of its employees rather than on violation of his constitutional equal protection rights, we are likewise not persuaded. Disparate treatment is a term of art that refers to a legal theory of discrimination "where an employer has treated a particular person less favorably than others *because of a protected trait*." *See Goree v. United Parcel Serv., Inc.*, 490 S.W.3d 413, 426 (Tenn. 2015) (emphasis added). As such, the term is generally used in the context of equal protection. If Mr. Holmes intended the

- 13 -

term to indicate different treatment under a City policy requiring fair and equal treatment of its employees, that meaning cannot be gleaned from Mr. Holmes's filings. Mr. Holmes's petition for judicial review specifically states that the City "violated his equal protection rights when it applied its policy disparately towards him." The petition does not reference any internal policy or other basis for his argument that the Commission erred in excluding evidence related to Mr. Austin and Mr. Jones. There is simply no basis from which we can conclude that Mr. Holmes's disparate treatment argument is based on anything other than constitutional equal protection. In light of this Court's opinion in *Echols*, the evidence related to Mr. Austin and Mr. Jones was immaterial in the absence of an assertion that either Mr. Austin or Mr. Jones was treated differently from Mr. Holmes based on his membership in a suspect class. As such, we conclude that the Commission did not commit reversible error in excluding that evidence.

### C. Substantial and Material Evidence

Finally, the chancery court determined that the Commission's decision was not supported by substantial and material evidence. The court stated that the Commission refused to acknowledge and consider Mr. Holmes's long-term service, his good disciplinary record prior to the altercation, and the discipline of similarly situated employees. The court explained that there did not appear to be any progressive discipline; rather, Mr. Holmes was terminated for a single violation with an otherwise exemplary record.

Section 246 of the City of Memphis Charter ("Charter") provides that the City may terminate an employee for "just cause," and provides that "[j]ust cause shall exist when the employer had a reasonable basis for the action taken." Section 248 of the Charter provides that on appeal to the Commission, "[t]he burden of proof required to sustain the action of the City shall be by a preponderance of the evidence. If, after a presentation of the proof, the hearing officer finds that there exists a reasonable basis for the disciplinary action taken, the action of the City shall be sustained." Mr. Holmes was terminated based on his violation of disciplinary rules prohibiting Memphis Fire Department employees from engaging in conduct that "is in breach of the public trust," "could be considered unbecoming of a member of the Fire Division or City of Memphis," or "could be viewed unfavorably by the public at large." The applicable disciplinary rules provide that such violations are punishable by disciplinary action up to and including termination. To prevail in the Commission proceedings, the City was required to demonstrate, by a preponderance of the evidence, that Mr. Holmes violated the applicable rules and that the violation, in light of the circumstances, furnished a reasonable basis for terminating his employment. *See City of Memphis v. Cattron*, No. W2010-01659-COA-R3-CV, 2011 WL 1902167, at \*5 (Tenn. Ct. App. May 13, 2011); *City of Memphis v. Civil Serv. Comm'n*, 238 S.W.3d 238, 244 (Tenn. Ct. App. 2007).

- 14 -

Mr. Bosby and Mr. Holmes both appeared before the Commission and presented their account of the altercation. Mr. Bosby testified that he never touched or threatened Mr. Holmes prior to being attacked from behind as he was walking down Mr. Holmes's driveway with his son. Mr. Bosby testified that Mr. Holmes hit him in the back of the head with his fist and a gun, and then hit him in the face and shoulder with a hammer. Mr. Bosby testified that he suffered a cut on his nose requiring stitches as well as a broken jaw that had to be wired shut for four weeks and caused him excruciating pain. Mr. Holmes, on the other hand, testified that Mr. Bosby attacked him in his garage, pushing him to the ground and kicking him in the stomach. Although Mr. Holmes insisted that he never had a gun in his possession during the altercation and that he swung the hammer at Mr. Bosby in self-defense, no physical evidence was presented to support his account of the events.

While we acknowledge that the evidence presented could support a determination different from the one the Commission reached, we are not permitted to substitute our own judgment for that of the Commission as to the weight of the evidence and neither is the chancery court. Resolving conflicting evidence is a job for the Commission, not the courts. *Wade v. Tenn. Dep't of Fin. & Admin.*, 487 S.W.3d 123, 134 (Tenn. Ct. App. 2015). We are satisfied that the record contains substantial and material evidence that Mr. Holmes's conduct during the altercation violated the aforementioned disciplinary rules. Additionally, we are satisfied that the City demonstrated that Mr. Holmes's disciplinary violations furnished a reasonable basis for terminating his employment. Mr. Holmes used a deadly weapon to cause severe injuries to Mr. Bosby in the presence of Mr. Bosby's five-year-old son. Mr. Holmes acknowledged that Mr. Bosby did not have or use any weapons during the altercation. Despite the physical evidence suggesting otherwise, Mr. Holmes has continued to insist that he acted in self-defense during the altercation. The chancery court ruled that the Commission erred in failing to acknowledge and consider Mr. Holmes's long-term service and disciplinary history prior to the altercation. However, evidence of Mr. Holmes's long-term service and disciplinary history was presented to the Commission and there is nothing in the record to suggest that the Commission did not consider it in making its decision. Rather, it appears that the Commission merely found that evidence to be outweighed by the evidence demonstrating the seriousness of Mr. Holmes's conduct. The courts are not permitted to substitute their own judgment for that of the Commission as to the weight of the evidence. In our view, that is precisely what the chancery court did in this case. Having thoroughly reviewed the record, we conclude that the Commission's decision to uphold Mr. Holmes's termination was supported by substantial and material evidence. The chancery court's holding to the contrary is therefore reversed.

## V. Conclusion

For the foregoing reasons, we reverse the judgment of the chancery court and remand this case for such further proceedings as are necessary and consistent with this opinion. The costs of this appeal are taxed to the appellee, Jerry Holmes, for which execution may issue if necessary.

_____
ARNOLD B. GOLDIN, JUDGE